IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:08-CV-62-D

| | | |
|---|---|---|
| CLAUDE DANIEL HUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| WAKE COUNTY BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

Claude Daniel Hunter ("Hunter" or "plaintiff") filed suit against the Wake County Board of Education ("Board" or "defendant") and Wake County Public Schools alleging race discrimination in violation of 42 U.S.C. §§ 1981 and 1983 and Title VII. Hunter contends that the Board failed to provide him and other custodial field supervisors with the same pay raise that buildings and grounds supervisors received, and Hunter attributes the difference to his race. The sole remaining defendant is the Board and the sole remaining claim is Hunter's section 1983 race-discrimination claim. The Board seeks summary judgment and contends that Hunter has failed to raise a genuine issue of material fact concerning his race-discrimination claim. As explained below, the court grants summary judgment to the Board.

I.

In January 2000, the Board began conducting a compensation study with the help of Arthur Anderson Consulting. See Hunter's Dep., Ex. 10. In 2001, Hunter began working for the Wake County Public School System ("School System") as a custodial field supervisor. See Hunter Dep. 13–14; Def.'s Mem. Supp., Ex. C ¶ 5 [hereinafter "Neter Aff."]. Custodial field supervisors oversee and manage the work of custodians, and independent contractors who provide custodial services for the School System. See Hunter Dep. 23–24; Def.'s Mem. Supp., Ex. B ¶ 5 [hereinafter "Haithcock Aff."]. As a custodial field supervisor, Hunter managed job assignments, set up schedules, tracked

time cards, and inspected the custodians' work. See Hunter Dep. 23. Hunter's responsibilities also included meeting with principals at each of the schools at which Hunter was responsible for custodial services. See id. at 24. On average, Hunter was responsible for supervising 18 schools and approximately 100 employees. See id. at 24–25. Hunter also performed custodial tasks when necessary. Id. at 25, 31.

The School System pays its employees using a schedule based on a pay scale which includes different pay grades "based on [employees'] duties and responsibilities." Haithcock Aff. ¶¶ 8–9; see id. ¶¶ 4–7; id., Attach. A [hereinafter "Salary Scale"]; Neter Aff. ¶¶ 5–8. When Hunter began his employment, all custodial field supervisors were paid based on a level 66 pay grade and Hunter received a salary of $2,096.33 per month. Neter Aff. ¶ 5. On November 1, 2001, Hunter's salary was increased to $2,158.83 per month. Id. In April 2002, the School System approved a new pay schedule for employees following the conclusion of the Arthur Anderson Consulting compensation study. See Hunter Dep., Ex. 10; Neter Aff. ¶ 6. At some point, Hunter attended a presentation regarding the results of the Arthur Anderson Consulting compensation study. See Hunter Dep. 66–68. Joe Desormeaux conducted the presentation and showed slides concerning the reorganization plan. See id. at 67; id. Ex. 9 [hereinafter "Pl.'s Resp. to Interrog."], Ex. A [hereinafter "Reorganization Plan"]. One slide provided a proposed target adjustment for salaries which grouped positions into four salary groups. See Reorganization Plan 11. On the slide, custodial field supervisors were grouped along with assistant supervisors and regional facility managers in the second highest category. See id. Supervisors and project managers were placed in the highest pay category. See id.

On April 2, 2002, Hunter received a letter from the School System informing him that he would now be paid based on a level 23 pay grade and that his salary would increase to $2,187.36 per month. Hunter Dep., Ex. 10; see Neter Aff. ¶ 6; cf. Salary Scale. According to the letter, the revised salary scale was available online. See Hunter Dep., Ex. 10. Under the School System's

2

Case 5:08-cv-00062-D    Document 32    Filed 05/25/10    Page 2 of 10

revised salary scale, buildings and grounds supervisors were placed on a level 29 pay grade. See Haithcock Aff. ¶ 8; Salary Scale. Hunter is black and alleges that buildings and grounds supervisors are predominantly white. See Pl.'s Resp. to Interrog. ¶ 10; see also Compl. 2. Buildings and grounds supervisors directly supervised eight to fourteen craftsmen and master craftsmen and were responsible for work planning and budgeting. Haithcock Aff. ¶ 6. Hunter and other custodial field supervisors were disappointed to learn that after the salary scale was revised, they were paid less than buildings and grounds supervisors. See Hunter Dep. 70–71. As a result, Hunter and other custodial field supervisors complained to the School System's compensation and salary group. See id. at 71–72, 83. Hunter wanted the compensation and salary group to tell him why the custodial field supervisors did not "get the same raise as everybody else." Id. at 72. Hunter was concerned that supervisors in other groups, but not custodial field supervisors, received a four-grade increase. Id. at 83; see id. at 70.

On February 3, 2003, Human Resources Administrator Samuel L. White informed Hunter that the custodial field supervisors would receive a pay grade increase from level 23 to level 24 resulting in a monthly salary of $2,335.55. See Hunter Dep., Ex. 11 (letter from Samuel L. White to Hunter); Salary Scale. This change placed Hunter and the other custodial field supervisors in the same pay grade as master craftsmen in building and grounds, master craftsmen in auto repair, and craftsmen in electrical. Haithcock Aff. ¶ 8; Salary Scale. However, custodial field supervisors continued to be paid less than assistant supervisors (level 27) and supervisors in buildings and grounds (level 29). Salary Scale. Craftsmen in buildings and grounds were paid less than custodial field supervisors, but more than custodians and head custodians. Id. In the custodial services department, custodial field supervisors were paid less than area coordinators, regional custodial managers, and the director of custodial services. Id. Regional custodial managers were paid on the same pay level (27) as assistant supervisors in buildings and grounds, whereas area coordinators were paid at a level 26. Id. Hunter claims that, despite complaining about the revised salary scale

3

as early as 2002, receiving several letters regarding the salary scale, and having the option of viewing the salary scale online, he did not learn about any pay discrepancies until after January 1, 2005. Hunter Dep., Ex. 13 ¶ 7 [hereinafter "Pl.'s Resp. to Req. for Admissions"].

Hunter compares himself to supervisors in buildings and grounds. See Compl. 3–4. Director of the Buildings and Grounds Department Gary Haithcock explained that supervisors in buildings and grounds were responsible for work planning and budgeting. See Haithcock Aff. ¶ 6. In addition, supervisors in buildings and grounds evaluated and supervised between eight and fourteen master craftsmen and craftsmen. See id. In contrast, custodial field supervisors did not engage in budgeting or evaluate custodians. See id. ¶ 5. Principals did. See id. Moreover, although buildings and grounds supervisors were not required to be licensed in a particular trade, many were licensed because a large number began working as craftsmen. See id. ¶ 6. Haithcock also explained that master craftsmen and craftsmen were paid more than custodians because their work required specific skills and many were licensed in a particular trade. Id. Furthermore, Haithcock explained that buildings and grounds supervisors were paid more than custodial field supervisors because buildings and grounds supervisors supervise higher-skilled and higher-paid employees. Id. ¶ 7.

As for Hunter's performance, the School System periodically evaluates its employees. See Hunter Dep., Exs. 1–5. Each evaluation contains several categories for which the employee evaluated receives a number from one (unsatisfactory) to five (superior). See id. Exs.1, 3–5.[1] On December 18, 2001, custodial services administrator Aaron Springs, Jr. evaluated Hunter's performance from August 30, 2001, to December 18, 2001. See id. Ex. 1. Springs rated Hunter's performance concerning his "[r]elationships with [o]thers" and "[j]ob [a]ttitude" as "need[ing] improvement." Id. Otherwise, Hunter was rated as meeting expectations or higher. See id. During

---

[1]In order from one to five, the performance scale provides: (1) unsatisfactory; (2) needs improvement; (3) meets expectations; (4) exceeds expectations; (5) superior. Hunter Dep., Exs. 1, 3–5.

4

Hunter's employment he repeatedly received poor evaluations concerning his relationships with others and his job attitude and participated in corrective counseling for these issues. See id. Exs. 1-8.

In December 2006, Hunter resigned and applied for disability retirement. See Hunter Dep. 15-22. Hunter's application was approved, and he receives approximately $1,000 per month in disability payments. See id. at 20-21.

On May 4, 2007, Hunter wrote a letter to Superintendent Adelphos John Burns regarding compensation for custodial field supervisors. See Hunter's Dep., Ex. 12. In the letter, Hunter explained that based on his understanding of the Arthur Anderson Consulting compensation study, custodial field supervisors would receive the same base pay as supervisors in other departments. Id. Hunter also described his earlier complaints about the pay discrepancies. See id. Hunter asked that Superintendent Burns look into why nothing had been done to adjust the custodial field supervisors' salaries. Id. On July 27, 2007, David Neter (who has been Chief Business Officer of the School System since August 2006) responded to Hunter's letter and explained that the Human Resource Department had reviewed the issues in Hunter's letter and that

> in April 2002, Wake County Public Schools moved custodial field supervisors to the non-certified salary grade of 23 with a retroactive effective date of July 1, 2001. According to [the School System's] personnel files, this resulted in a 1.3% salary increase to [Hunter]. In January 2003, based upon a Maintenance & Operations reorganization, custodial field supervisors received an upgrade from non-certified salary grade 23 to non-certified salary grade 24. According to [the School System's] personnel files, this resulted in a 6.8% salary increase to [Hunter].

Hunter Dep., Ex. 14. Neter also explained that Hunter had received all salary increases and local supplements that Hunter had been eligible for during his employment. Id.

In September 2007, Hunter filed a discrimination claim with the Equal Employment Opportunity Commission ("EEOC"). See Compl. 2. In November 2007, the EEOC issued Hunter a right-to-sue letter. Id. On February 20, 2008, Hunter filed suit against Wake County Public Schools and the Board alleging discriminatory pay based on his race in violation of the 42 U.S.C.

5

§§ 1981 and 1983 and Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17. See Compl. 1–7.

On July 8, 2008, the court dismissed Wake County Public Schools as a defendant and dismissed plaintiff's Title VII and section 1981 claims [D.E. 14]. The court allowed plaintiff to proceed with his section 1983 claims. Id. On August 10, 2009, the parties agreed to dismiss plaintiff's section 1983 retaliation claim [D.E. 24]. After discovery closed, the Board filed a motion for summary judgment [D.E. 25], and plaintiff responded in opposition [D.E. 30].

II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation omitted) (emphasis removed). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Hunter alleges employment discrimination based on his race under 42 U.S.C. § 1983. Specifically, Hunter argues that the Board discriminated against him based on his race by failing to give custodial field supervisors the same pay raise as buildings and grounds supervisors. See Compl. 3–4; Pl.'s Mem. Opp'n 6–8. Where a plaintiff asserts a disparate-treatment claim under section 1983 and the Fourteenth Amendment, courts use the proof framework developed for Title

6

VII to evaluate the claim. See, e.g., Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004).[2] Under this burden-shifting framework, first announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff first must establish a prima facie case of discrimination. See, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc). If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to produce evidence that the employer took the adverse employment action for a legitimate, nondiscriminatory reason. See, e.g., St. Mary's Honor Ctr., 509 U.S. at 506–07; Burdine, 450 U.S. at 253–54. If the employer meets its burden of production, then the plaintiff must prove by a preponderance of the evidence that the employer's stated reason for the adverse employment action was in fact a mere pretext for discrimination. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Hill, 354 F.3d at 285.

Hunter alleges race discrimination in compensation. Accordingly, Hunter's prima facie case requires: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment." White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 604 (E.D.N.C. 2006).

For purposes of evaluating the motion for summary judgment, the court assumes that Hunter meets the first three elements of his prima facie case. The court focuses on whether Hunter has raised a genuine issue of material fact that similarly-situated employees outside the protected class received more favorable treatment.

The standard for whether employees are similarly situated requires that their circumstances

---

[2]Hunter's memorandum contends that he also seeks relief for disparate impact under section 1983 and the Fourteenth Amendment. See Pl.'s Mem. Opp'n 7. Hunter's disparate-impact theory is not viable. See, e.g., Franklin v. City of Evanston, 384 F.3d 838, 846 (7th Cir. 2004).

7

be nearly identical. See, e.g., Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008); Wheatley v. Wicomico County, 390 F.3d 328, 332–33 (4th Cir. 2004); Cronquist v. City of Minneapolis, 237 F.3d 920, 928 (8th Cir. 2001). Under this standard, Hunter must prove that he and the other custodian field supervisors were similarly situated in all material respects with buildings and grounds supervisors. See, e.g., Lightner, 545 F.3d at 265 ("The similarity between comparators . . . must be clearly established in order to be meaningful."); Wheatley, 390 F.3d at 333; Dandy v. United Parcel Serv., Inc., 388 F.3d 263, 274 (7th Cir. 2004). Relevant factors to consider in disparate-compensation claims include whether the plaintiff and the proposed comparators shared similar "attributes, experience, education, and qualifications," Dandy, 388 F.3d at 274 (quotation omitted), or performed the same type of tasks. Wheatley, 390 F.3d at 332–33.

In this case, Haithcock explained in detail the material differences between the experience and tasks of supervisors in buildings and grounds as compared to custodial field supervisors. See Haithcock Aff. ¶¶ 5–8. In summary, supervisors in buildings and grounds perform different tasks than custodial field supervisors, and supervise higher-skilled and higher-paid employees than custodial field supervisors. See id. Moreover, Hunter himself acknowledges that custodial field supervisors and supervisors in buildings and grounds do "different things" even if they are "all supervisors." Hunter Dep. 105. Thus, custodial field supervisors are not similarly situated to buildings and grounds supervisors.

In opposition to this conclusion, Hunter cites one Arthur Anderson Consulting slide — presented during a 2001 compensation meeting — titled "Strategy and Example – target for adjustment of salaries" which groups job titles into four groups but does not provide any reasoning for its conclusions. See Reorganization Plan 11; see also Pl.'s Mem. Opp'n 8–9. The slide, however, does not support a conclusion that the jobs Hunter is comparing were similarly situated in all material respects. To the contrary, the evidence demonstrates that Hunter and the comparators performed different tasks and did not share similar attributes, experience, and qualifications. See,

8

e.g., Hunter Dep. 105; Haithcock Aff. ¶¶ 5–8. Accordingly, because Hunter has failed to establish a prima facie case, the Board is entitled to summary judgment.

Alternatively, even if Hunter established a prima facie case of race discrimination, Hunter's claim still fails. Once a plaintiff establishes a prima facie case of race discrimination, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill, 354 F.3d at 285. Here, the Board met its burden by producing an affidavit from Building and Grounds Department Director Gary Haithcock explaining that "[t]he Supervisors in Building and Grounds are paid more than Custodial Field Supervisors because they supervise higher skilled, high-paid employees. Even though they both use the word 'supervisor' in the title, the positions are completely separate and require different competencies." Haithcock Aff. ¶¶ 2, 7.

Because the Board has met its burden of production, the presumption drops from the case and Hunter must show race discrimination. See Reeves, 530 U.S. at 142–43; Hill, 354 F.3d at 285. In order to show race discrimination, a plaintiff typically tries to show that the employer's proffered legitimate explanation is pretextual (i.e., a sham). See, e.g., Hill, 354 F.3d at 285. "[T]he plaintiff can prove pretext by showing that the [employer's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race discrimination]." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004) (quotations omitted); see Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004).

Hunter has not raised a genuine issue of material fact that the Board's proffered legitimate explanation for the pay differential is pretextual. Hunter's only evidence is the slide concerning the Arthur Anderson Consulting compensation study. See Pl.'s Mem. Opp'n 8–9. As explained, however, the slide cannot bear the weight that Hunter assigns to it. Thus, the Board is entitled to summary judgment. See Price, 380 F.3d at 216–17; Mereish, 359 F.3d at 336–39. In light of this conclusion, the court need not address the Board's argument concerning the statute of limitations.

9

III.

As explained above, the court GRANTS the Board's motion for summary judgment [D.E. 25]. The Clerk of Court is DIRECTED to close the case.

SO ORDERED. This 25 day of May 2010.

                                              JAMES C. DEVER III
                                              United States District Judge